Filed 8/6/26  In re E.M. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| In re E.M. et al., a Persons Coming Under the Juvenile Court Law. | C104887 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br>        Plaintiff and Respondent,<br><br>v.<br><br>I.R. et al.,<br>        Defendants and Appellants. | (Super. Ct. Nos. JD242410 & JD242412) |

I.R. (mother) and J.M. (father) appeal the juvenile court's orders terminating their parental rights and freeing the minors E.M. and M.M. (collectively, the minors) for adoption.  (Welf. & Inst. Code, § 366.26.)[1]  The parents contend the juvenile court erred in finding the beneficial parent-child relationship exception did not apply.  We will affirm the juvenile court's orders.

---

[1]    Undesignated section references are to the Welfare and Institutions Code.

1

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Case Initiation and Reunification Proceedings*

In March 2023, the Sacramento County Department of Child, Family, and Adult Services (the Department) filed a section 300 petition alleging the newborn E.M. came within section 300, subdivision (b)(1), due to mother's substance abuse history and mother's positive test for alcohol at the time of E.M.'s birth.[2]  A similar petition was filed regarding M.M., who was one year old at the time, based on mother's substance abuse and father's failure to protect M.M.  (§ 300, subd. (b)(1).)

The March 2023 detention report stated that mother had come to the hospital in February 2023 " 'passed out drunk' " and was admitted.  Mother acknowledged to the social worker that she drank alcohol while in labor with E.M.  Father minimized mother's alcohol abuse issues.  M.R.,[3] the father of the minors' six-year-old half-sibling I.R. (the half-sibling), offered to care for M.M., explaining he has done so "on and off" throughout her life.

Later that month, the juvenile court ordered minors detained.

The April 2023 jurisdiction/disposition report stated that mother confirmed to the social worker that she was addicted to alcohol, and she drank while pregnant with each of the minors.  When she was first pregnant with E.M., mother and M.M. both lived with M.R.  Mother eventually moved out, but M.M. continued living with M.R., and he remained M.M.'s "primary caretaker."  Father claimed he was unaware of mother's alcohol addiction until the February 2023 incident.

The April 2023 jurisdiction/disposition report stated that M.R. first met M.M. when she was five days old and had been her primary caregiver for the majority of her

---

[2]    Her blood alcohol content was allegedly 0.11 percent.

[3]    To protect their privacy, we will to this individual and the minor's half-sibling by their initials.  (Cal. Rules of Court, rule 8.90(b)(1), (10), (11).)

life. M.R. became aware of mother's alcohol addiction in 2015, with her drinking getting " 'real bad' " in 2022. Once, in March 2022, mother was supposed to be watching M.M. and the half-sibling (who also lived with M.R.), but mother was not there when M.R. returned home at 8:00 a.m., and she did not come back or answer her cell phone for two days. That summer, mother regularly " 'disappear[ed]' " and refused to answer her cell phone. During these incidents, father never came to care for M.M., and M.R. repeatedly had to take time off from work to care for M.M. In October 2022, the half-sibling reported that mother left her and M.M. alone in a running car while mother used methamphetamine at a nearby homeless encampment. Mother and father removed M.M. from M.R.'s care soon after E.M.'s birth in March 2023. M.R. said he loved M.M. "immensely," and held her out as his own child. M.M.'s babysitter noticed that M.M. referred to M.R. as " 'dad' " or " 'papa.' " M.R. asked that the minors be placed with him. Subsequent paternity testing revealed that father, not M.R., was the biological father of both of the minors.

In June 2023, the juvenile court placed M.M. with M.R.

Later that month, the juvenile court sustained the petitions and adjudged both of the minors to be dependents of the court, removed them from parental custody, and ordered reunification services and visitation for both parents.

A November 2023 progress report noted that mother had one visit with the minors in April, two visits in October, and two visits in November. Visits had been "going well." Father also had regularly visited the minors.

During the March 2024 six-month and June 2024 status review hearings, the juvenile court continued the minors as dependent children of the court and ordered additional services and visitation for the parents.

The September 2024 permanency review report noted that E.M. was still living with the same family that she had been placed with in March 2023, and M.M. was still living with M.R. Although mother had completed a parenting class, she had been

3

released from a sober living facility due to a positive alcohol test and dismissed from individual counseling and group therapy due to missing too many sessions. She failed to communicate with the social worker for more than a month, and the social worker stopped visits with the minors because mother had missed six in a row. Father, on the other hand, had completed services, secured an apartment, and had stable employment. He hoped to have extended unsupervised visits with the minors soon. The social worker recommended terminating services for mother and giving father more time to participate in extended unsupervised visits.

A December 2024 addendum report noted that father's visits were going well and recommended placing the minors with father.

In December 2024, during the 18-month review hearing, the juvenile court continued the minors as dependents of the court, terminated reunification services for mother, placed the minors with father, ordered visitation for mother, and ordered that mother should not be present in father's home.

B.    *Section 387 Petitions*

In January 2025, the Department filed section 387 petitions alleging the prior disposition was no longer effective because father violated court orders and placed the minors at risk by allowing mother to be present and unsupervised with the minors, despite mother suffering from untreated mental health issues and being under the influence of drugs and alcohol. In addition, father failed to provide adequate care because E.M. had what appeared to be a bite mark on her leg and severe and untreated diaper rash and eczema.

According to a subsequent declaration, on January 10, 2025, father left the minors in mother's care while at a store, even though mother at the time was under the influence of illegal substances and exhibited signs of mental illness. Mother tried to give the minors away to strangers while at the store. Mother was taken to the hospital and tested positive for alcohol and illegal drugs. At the hospital, mother acknowledged that she was

4

living with father and the minors. When asked about the incident, father claimed it was a " 'coincidence' " that he had run into mother at the store and denied knowing that she was under the influence.

Five days after the incident at the store, father called E.M.'s former caregivers and asked them to take the minors for a day because he felt "overwhelmed." The minors were "very hungry" when they arrived at the former caregivers' home and appeared to be "experiencing emotional distress." They cried easily, were fussy, and feared being left alone. The former caregivers also noticed E.M. had a bite mark, "severe" diaper rash, and "severe" eczema. It appeared that E.M.'s diaper rash was "due to inadequate hygiene." An examining nurse practitioner was similarly concerned that the eczema was "possibly due to neglect and lack of proper care."

In the January 2025 detention report, the social worker recommended the minors be detained in out-of-home foster care. M.M. said that mother was also living at father's apartment. M.R. also expressed concern about missed medical appointments and the minors' hygiene and health.

The juvenile court found a prima facie showing had been made that the prior court order was no longer effective and there were no reasonable means by which the minors' physical and emotional health could be protected without removing them from father's custody. The court detained the minors and ordered visitation for the parents and services for father.

The February 2025 section 387 jurisdiction/disposition report noted that mother claimed that she had shown up unannounced to father's apartment on January 10, 2025. When M.M. saw her, M.M. "came out and came into my arms," and the minors wanted to show mother their room. When father and the minors decided to leave to go to the store, mother followed them there. Mother acknowledged she was "under the influence" that day.

According to mother, M.M. loved father and wanted to be with her and father. Father similarly reported that the minors wanted to be with him. The half-sibling said, however, that M.M. was "really happy" living with her and M.R. The social worker noted that E.M.'s caregivers (who were the same individuals as before E.M. was briefly placed with father) were "very attentive and engaged." The social worker asked the juvenile court to sustain the petitions, remove the minors from father's care, terminate father's reunification services, and set a section 366.26 hearing.

During the contested section 387 jurisdiction and disposition hearing, father testified that mother had followed him and the minors to the store on January 10, 2025. Father acknowledged he had previously told the social worker that it was "just a coincidence." When pressed, father said, "I didn't plan it…. She planned it." The juvenile court found that father's testimony was not credible. The court sustained the section 387 petition, continued the minors as dependent children, terminated father's reunification services, and set a section 366.26 hearing.

C.     *Section 366.26 Briefing and Hearing*

The August 2025 selection and implementation report noted that the minors had been returned to the same caregivers as before their brief placement with father from December 14, 2024, to January 22, 2025. Given that E.M. was first placed with her current caregivers in March 2023, and M.M. had been formally placed with M.R. in June 2023, both of the minors had spent most of their lives with their current caregivers. E.M. was "doing well" and was "stable" in her placement. The caregivers were "very responsive" and met E.M.'s emotional, physical, and developmental needs. M.M. was similarly "doing well" and "stable" living with M.R. She had a strong connection with M.R. and her half-sibling, and M.R. met her emotional, physical, and developmental needs.

As for the parents, the April 2023 jurisdiction/disposition report noted that both parents had regularly attended visits with the minors since May 2025. Still, mother had only resumed regular visitation in May 2025. In the Department's assessment, it would not be detrimental to the minors to terminate either of the parents' parental rights with a plan of adoption. The Department asked the juvenile court to terminate parental rights and free the minors for adoption.

The Department argued the parents could not establish the beneficial parent-child relationship exception. The Department conceded that the parents had maintained consistent contact with the minors. However, the parents could not show that either of the minors had a substantial, positive emotional attachment to them. The minors had spent most of their lives placed with their current caregivers, and they looked to their caregivers for support and to meet their daily needs. The minors' relationship with mother and father was nothing more than "frequent and loving contact or pleasant visits." In addition, the parents could not show that terminating the parental attachment would be detrimental to either of the minors given that they had stability, love, and support with their caregivers.

During the September 2025 hearing, mother and father each argued that the beneficial parent-child relationship exception applied, but neither party presented any additional supporting evidence, such as a bonding study. Father argued that he had visited "consistently and regularly." Combined with the time the minors were placed with him, he argued he had "established [a] relationship with the children."

The juvenile court noted that, since reunification services had been terminated, the focus had shifted to selecting a permanent plan that ensured stability, with adoption as the preferred plan where, as here, the children were generally adoptable and were "thriv[ing]" with their current caregivers. Turning to the beneficial relationship exception, the court outlined the three factors as explained in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). "The parents have visited for short periods of time. Neither

parent has resumed a parental role in either child's life to the level necessary. And from what the Court has reviewed and the evidence presented, each child's comfort and security [has] looked towards the de facto parents in the first instance certainly and that is in the child's best interest." As such, the beneficial parent-child relationship exception was found not to apply. The court terminated parental rights and freed the minors for adoption.

Both parents timely appealed.

DISCUSSION

Mother and father argue the juvenile court erred in terminating their parental rights because it should have applied the beneficial parent-child relationship exception to adoption. We disagree.

A. *Legal Background*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence that the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption, unless a statutory exception applies. (§ 366.26, subd. (c)(1); *In re Z.G.* (2026) 19 Cal.5th 373.) One such exception is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

To establish the beneficial parent-child relationship exception, the parent must show by a preponderance of the evidence three elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra,* 11 Cal.5th at p. 631, italics omitted; see *id*. at p. 636.) In assessing whether termination would be detrimental, the juvenile court "must decide whether the harm from

8

severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id*. at p. 632.) When the parent meets this burden, the exception applies such that it would not be in the child's best interest to terminate parental rights, and the court selects a permanent plan other than adoption. (*Id*. at pp. 636-637.)

We review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C., supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id*. at pp. 639-640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even when substantial evidence to the contrary also exists. (*Id*. at p. 640.) The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for abuse of discretion. (*Ibid*.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

B.    *Analysis*

Neither mother nor father has established that the juvenile court erred in determining that each had failed to offer sufficient evidence to establish the applicability of the beneficial parent-child relationship exception. On the first element, while there is evidence that mother and father visited the minors, it is questionable whether mother's visitation could be characterized as regular. She failed to visit with the minors from May through September 2023 and missed six consecutive visits in 2024, leading the social worker to stop visits in August 2024. Mother did not resume visiting regularly with the minors until May 2025. Regardless, the Department conceded the issue during the section 366.26 hearing, so we will assume that this element is met as to both parents.

9

However, there is a lack of evidence that either mother or father established the kind of bond required to satisfy the second element. E.M. was a newborn when she was removed from the parents' care, and she had lived with her same caregivers for almost her entire life, except for the five weeks that she spent with father. M.M. similarly had spent the majority of her young life with M.R., except for the five weeks she spent with father. Moreover, the minors appeared to be "experiencing emotional distress," after their five-week stay with father. After leaving father's home, the minors cried easily, were fussy, and feared being left alone. Yet, after being returned to their respective caregivers, they "stab[ilized]" and "d[id] well." To the extent the Department's selection and implementation report could have described the visits in more detail, this negative response to living with father for only five weeks indicates that, even if the minors were affectionate or friendly with the parents during visits, there is no substantial evidence that they looked to either of the parents as anything more than friendly visitors. (See *Caden C., supra*, 11 Cal.5th at p. 632 [whether minor has a substantial, positive, emotional attachment to a parent involves numerous factors, such as the child's age, portion of the child's life spent in the parent's custody, the positive or negative effect of interaction between parent and child, the child's specific needs, and how the child feels about and interacts with the parent].)

We disagree with parents that the trial court erred in explaining that, with respect to the second element of the beneficial parent-child relationship, "[n]either parent has resumed a parental role in either child's life to the level necessary," with the minors looking toward their caregivers for comfort and security. As courts have explained, in analyzing the second element, it is not error for a juvenile court to consider whether a parent fulfils a " 'parental role.' " (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 309.) As the *Katherine J.* court explained, *Caden C.* "prohibits juvenile courts from finding against a beneficial relationship *solely because* a parent has failed to surmount the issues that initially brought the child into dependency care." (*Katherine J.,* at p. 309.)

However, nothing in *Caden C.* "prohibit[s]" a juvenile court from considering whether the "*negative impact* of [the parent's] unresolved issues on [the minor] were antithetical to the kind of beneficial parental relationship required by section 366.26." (*Katherine J.,* at p. 309.) Under the circumstances, we find no error.

As to the third element, given the limited bond between the minors and parents, it was reasonable for the juvenile court to conclude that terminating the minors' relationship with parents would not be detrimental when balanced against the countervailing benefit of a new, adoptive home.

### DISPOSITION

The juvenile court's orders are affirmed.

\s\
_____
KRAUSE, J.

We concur:

\s\
_____
EARL, P. J.

\s\
_____
HULL, J.